IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: MOON GROUP INC., *et al.*, | ) Chapter 11 |
| | ) Case No. 21-11140 (JKS) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| DON A. BESKRONE, CHAPTER 7 | ) Adv. Proc. No. 21-51176 (JKS) |
| TRUSTEE OF MOON GROUP, INC., *et al.*, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| KORE CAPITAL CORPORATION, | ) Misc. No. 22-470 (MN) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Ricardo Palacio, Gregory A. Taylor, ASHBY & GEDDES, P.A., Wilmington, DE – Counsel for Don A. Beskrone, as Chapter 7 Trustee of Moon Group, Inc., *et al*.

Philip S. Rosenzweig, William C. Katz, SILVERANG, ROSENZWEIG & HALTZMAN, LLC, King of Prussia, PA – Special Litigation Counsel to Don A. Beskrone, as Chapter 7 Trustee of Moon Group Inc., *et al.*

Michael G. Busenkell, GELLERT SCALI BUSENKELL & BROWN, LLC, Wilmington, DE; David S. Musgrave, GORDON FEINBLATT LLC, Baltimore, MD – Counsel for Kore Capital Corporation.

June 6, 2023
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

This dispute arises out of the chapter 7 cases of Moon Group, Inc. and certain affiliates ("the Debtors" or "Moon Entities") in connection with an adversary proceeding ("the Adversary Proceeding") brought by plaintiff Don A. Beskrone, as Chapter 7 Trustee ("the Trustee") against defendant Kore Capital Corporation ("Kore"). The Adversary Proceeding asserts claims arising out of the prepetition line of credit extended by Kore to the Debtors pursuant to a revolving credit agreement dated May 15, 2020. In mid-July 2021, Kore stopped advancing funds to the Debtors, allegedly resulting in the Debtors' inability to fulfill customer contracts or operate their businesses.

Pending before the Court is the Trustee's motion for leave to appeal (D.I. 1, 2) ("the Motion for Leave") the Bankruptcy Court's September 30, 2022 Order (Adv. D.I. 81)[1] ("the Interlocutory Order") pursuant to Federal Rule of Bankruptcy Procedure 8004(a). The Interlocutory Order granted, in part, a motion for judgment on the pleadings (Adv. D.I. 26) in favor of Kore with respect to Counts I-VI and VIII of the Trustee's amended complaint (Adv. D.I. 12) ("the Amended Complaint") for the reasons set forth in the Bankruptcy Court's accompanying Opinion, *In re Moon Group, Inc.*, 2022 WL 4658615 (Bankr. D. Del. Sept. 30, 2022) ("the Opinion"). The Court has considered Kore's opposition to the Motion for Leave (D.I. 4), as well as the Trustee's reply (D.I. 6) in further support of his Motion for Leave. For the reasons set forth herein, the Court will grant the Motion for Leave.

---

[1] The docket of the adversary proceeding, captioned *Beskrone v. Kore Capital Corporation*, Adv. No. 21-51176 (JKS) (Bankr. D. Del.), is cited herein as "Adv. D.I. __."

I.     **BACKGROUND**[2]

    A.     **The Parties**

The Moon Entities operated several business lines: a wholesale tree and shrubbery nursery; a commercial landscape maintenance and site management company; and a landscape construction business. The Moon Entities serviced large commercial contracts, primarily on a seasonal basis, which is a cash-intensive business model. Given this kind of work, the Moon Entities carried substantial accounts receivable, which from time to time, resulted in cash flow shortages when awaiting remittances from customers. The Moon Entities required a substantial line of credit to ensure adequate cash flow.

Kore provides lines of credit secured primarily by accounts receivable, as well as "factoring" loans. Kore borrows capital from other lenders, earning a profit from the margin between the rate at which it borrows these funds and the higher rate at which it lends them.

One of the Moon Entities – Moon Landscaping, Inc. ("MLI") – was a party to a master service agreement with StoneMor Operating LLC ("the StoneMor Agreement") whose terms would have extended through December 31, 2024. StoneMor is a leading owner and operator of cemeteries and funeral homes, and, prior to this dispute, the Moon Entities' largest customer.

    B.     **The Line of Credit**

Although the Moon Entities had two existing loan facilities secured by certain of the Moon Entities' real and personal property, the cyclical cash flow needs due to the seasonality of their businesses required additional liquidity. On May 15, 2020, the Moon Entities entered into a revolving credit agreement with Kore ("the Revolving Credit Agreement"). Under the Revolving Credit Agreement, Kore was to advance funds to the Moon Entities based on invoices issued by

---

[2]     The following facts, which appear to be undisputed, are intended merely to frame the inquiry before the Court.

the Moon Entities to their customers for services rendered. (The Revolving Credit Agreement, along with all the loan modifications thereto, are collectively referred to as the "Line of Credit."). The Line of Credit was secured by a security interest in the Moon Entities' accounts receivable. The amount that the Moon Entities were permitted to draw from the Line of Credit is based upon a percentage of the Moon Entities then outstanding accounts receivable. Kore initially agreed to advance the Moon Entities 80 percent of the receivables for customers other than StoneMor, but only 35 percent of the StoneMor receivables.

The Line of Credit contemplates that the Moon Entities' receivables would be paid by customers directly to Kore through a "lockbox" financing arrangement. Under this arrangement, the Moon Entities were in the position of asking Kore for their own money, as all of their accounts receivable were paid into the lockbox operated by Kore. In turn, Kore would advance funds (not exceeding the above-noted percentages) to meet the Moon Entities' short-term cash flow needs. Thus, the Moon Entities' ability to pay its debts as they came due was wholly dependent upon Kore complying with its duty to make advances under the Line of Credit. Notably, section 2.1 of the Revolving Credit Agreement provides, in part:

> 2.1 <u>Credit Facility</u>. At Borrower's request during the Term of this Agreement, Lender ***in its sole discretion*** may make Advances to Borrower, subject to receipt of such financial information as Lender shall require and as otherwise provided in this Agreement.

(Amend. Complaint, Ex. 1 (Revolving Credit and Security Agreement) at § 2.1 (emphasis added)).

Section 2.3 of the Revolving Credit Agreement provides, in part:

> 2.3 <u>Adjustments</u>. Lender shall determine the amount that may be made available to Borrower under the [Revolving] Credit Facility based on the most recent Accounts Reporting Certificate delivered to Lender in accordance with this [Revolving Credit] Agreement and such other information as may be available to Lender.

(*Id*. § 2.3). The Revolving Credit Agreement contained the following termination provision:

3

> [I]f the Lender exercises *its discretion* to cease making Advances under this Agreement and no Event of Default has occurred and is continuing, Borrower may terminate this Agreement by delivering 10 days written notice to Lender and, in such event, Borrower shall not be liable to Lender for any Termination Fee.

(*Id*. at § 10.12 (emphasis added)).

### C. Kore's Refusal to Fund the Line of Credit

After entering into the Line of Credit, the Moon Entities needed additional liquidity, and the Line of Credit was amended several times to increase both the credit limit and the percentage of StoneMor receivables relative to which Kore would make advances. Notwithstanding, the Trustee asserts that the time between their request for funding and Kore's advances expanded, exacerbating the Moon Entities' liquidity issues. In July 2021, Kore demanded that the Moon Entities engage a financial "cash flow consultant," selected by Kore, at the Moon Entities' expense, but the Moon Entities declined. Around the same time, the Trustee asserts, the outstanding principal balance of the Line of Credit was approximately $5 million, while the Moon Entities' accounts receivable totaled approximately $9 million; accordingly, the Trustee contends, Kore was oversecured.

On or about July 10, 2021, Kore refused to fund the next draw on the Line of Credit. Upon Kore's denial to fund, the Moon Entities anticipated failing to make payroll, which would have caused a default under the StoneMor Agreement. To avoid such a default, the Moon Entities requested StoneMor pay its upcoming invoice directly to the Moon Site Entities.

On July 16, 2021, Kore issued a Notice of Default to the Moon Entities. In response, the Moon Entities asserted that the declaration of default was invalid and that Kore breached the Line of Credit first by refusing and/or failing to fund the next draw. On July 23, 2021, Kore filed a complaint in confession of judgment against the Moon Entities, as well as a receivership action seeking imposition of a receivership over the Moon Entities. In addition, Kore filed a civil suit

4

against StoneMor first in the Court of Common Pleas of Bucks County, Pennsylvania, and then in United States District Court for the Eastern District of Pennsylvania. Kore's civil suit against StoneMor alleges a cause of action for breach of contract based on Kore's contention that it "stands in the shoes of [the Debtors] with respect to StoneMor's obligations to pay [pre-petition] amounts due to Moon" and that StoneMor breached its contract with the Debtors by making three pre-petition payments to the Debtors rather than to Kore. Kore has continued to prosecute its civil suit against StoneMor even after receiving payment in full.

D.  **The Adversary Proceeding**

The Moon Entities filed voluntary chapter 11 petitions on August 12, 2021 ("the Petition Date"). Their cases were later converted to cases under chapter 7 of the Bankruptcy Code. On September 17, 2021, Debtors paid Kore $5,455,456.13, representing one hundred percent (100%) of the principal and interest due to Kore on the Line of Credit, subject to a reservation of rights with respect to the matters complained of in the Adversary Proceeding. The Amended Complaint includes the following claims: (i) breach of contract, (ii) breach of implied duty of good faith and fair dealing, (iii) tortious interference with contract, (iv) common law fraud, (v) fraudulent misrepresentation, (vi) promissory estoppel, and (vii) violation of the automatic stay. Prosecution of the Amended Complaint was assumed by the Trustee upon conversion of the cases.

Kore's answer to the Amended Complaint contains a counterclaim seeking various fees – including overadvance fees, diversion of payment fees, field examination expenses, bond charges, termination fee, consulting fees, wire fees, and legal fees and expenses – which, as of September 27, 2021, totaled approximately $727,000, exclusive of interest. (Adv. D.I. 13 at 14).

E.  **The Interlocutory Order**

On March 2, 2022, Kore moved for judgment on the pleadings with respect to the Amended Complaint, arguing that it had unfettered discretion to exit the lockbox lending arrangement based

5

on the plain language of the Line of Credit. The Trustee's opposition relied on cases specific to a lockbox line of credit financing arrangement, which uniquely enables the lender to drain the borrower of all liquid capital. Because there is an implied duty of good faith and fair dealing, the Trustee argued, the lender does not have unfettered discretion to exit the lockbox line of credit; rather, the lender has an obligation to provide the borrower with reasonable notice and opportunity to refinance the debt. The Trustee asserted that, in the very few times that a federal court has considered a lockbox line of credit financing arrangement, that court has imposed upon the lockbox lender an obligation not to exit the line of credit without notice, but rather to give the borrower a window in which to refinance, because the lender controls the borrower's liquid assets. The Trustee cited three cases in support of his position: *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 759 (6th Cir. 1985); *Quality Automotive Co. v. Signet Bank/Maryland*, 775 F. Supp. 849, 853 (D. Md. 1991); and *In re Bailey Tool & Mfg. Co.*, 2021 WL 6101847 (Bankr. N. D. Tex. Dec. 23, 2021).

The Bankruptcy Court rejected the Trustee's argument, distinguishing the cases on which he relied, and holding that the "sole discretion" language in the Line of Credit gave Kore unfettered discretion to make or withhold advances and exit the Line of Credit at any time. *In re Moon Group*, 2022 WL 4658615, at *9. As the Bankruptcy Court explained, Maryland law governs the Line of Credit, and although Maryland law recognizes the implied duty of good faith and fair dealing (including in the lending context), courts have clarified that this duty does not obligate a party to take affirmative actions that it is not clearly required to take under the contract. *See, e.g.*, *Marland v. Safeway, Inc.*, 65 Fed. Appx. 442, 449 (4th Cir. 2003). Based on this authority, the Bankruptcy Court ruled that the Trustee's claims were not plausible. "Kore had broad contractual authority to withhold advances. Consequently, Counts I-VI and Count VIII in the Amended Complaint are

6

barred as a matter of law, and judgment on the pleadings will be entered in favor of Kore on those counts." *Id*. at *1.

On October 14, 2022, the Trustee filed his Motion for Leave to appeal the Interlocutory Order (D.I. 1), which is fully briefed. This Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

II. **JURISDICTION AND STANDARD OF REVIEW**

This Court has jurisdiction to hear appeals "with leave of the court, from . . . interlocutory orders and decrees of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(3). Section 158(a) does not identify the standard district courts should use in deciding whether to grant such an interlocutory appeal. *See id.* "Typically, however, district courts follow the standards set forth under 28 U.S.C. § 1292(b), which govern interlocutory appeals from a district court to a court of appeals." *In re AE Liquidation, Inc.*, 451 B.R. 343, 346 (D. Del. 2011).[3]

Under the standards of section 1292(b), an interlocutory appeal is permitted only when the order at issue (1) involves a controlling question of law upon which there is (2) substantial ground for difference of opinion as to its correctness, and (3) if appealed immediately, may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974). Entertaining review of an interlocutory order under § 1292(b) is appropriate only when the party seeking leave to appeal "establishes exceptional circumstances [to] justify a departure from the basic policy of postponing review until after the

---

[3] *See also In re Philadelphia Newspapers, LLC,* 418 B.R. 548, 556 (E.D. Pa. 2009) ("Based upon the decision of the Third Circuit in *Bertoli v. D'Avella (In re Bertoli)*, 812 F.2d 136, 139 (3d Cir. 1987), courts within this Circuit confronted with the decision whether to grant leave to allow an interlocutory appeal are informed by the criteria in 28 U.S.C. § 1292(b)").

7

entry of final judgment." *In re Del. and Hudson Ry. Co.*, 96 B.R. 469, 472-73 (D. Del. 1989), *aff'd*, 884 F.2d 1383 (3d Cir. 1989). In part, this stems from the fact that "[p]iecemeal litigation is generally disfavored by the Third Circuit." *In re SemCrude, L.P.*, 2010 WL 4537921, at *2 (D. Del. Oct. 26, 2010) (citing *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)). Further, leave for interlocutory appeal may be denied for "entirely unrelated reasons such as the state of the appellate docket or the desire to have a full record before considering the disputed legal issue." *Katz*, 496 F.2d at 754.

### III.    ANALYSIS

#### A.    Controlling Question of Law

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." *Katz*, 496 F.2d at 755. "'[C]ontrolling' means serious to the conduct of the litigation, either practically or legally. And on the practical level, saving of time of the district court and of the expense of the litigants [has been] deemed . . . to be a highly relevant factor." *In re Boy Scouts of Am.*, 2021 WL 1174573, * 4 (D. Del. Mar. 29, 2021) (internal citation omitted). Courts have cautioned that a controlling question of law must be one "that the reviewing court could decide quickly and cleanly without having to study the record." *In re Cross Media Mktg. Corp.*, 2007 WL 2743577, at *2 (S.D.N.Y. Sept. 19, 2007) (internal citations omitted).

The Trustee argues that the Bankruptcy Court erred in dismissing Counts I-VI and VIII of the Amended Complaint. Although the Bankruptcy Court examined and applied the language contained in the Line of Credit, the Trustee argues, the Bankruptcy Court treated the Line of Credit like any other lending agreement, and dismissed the principle embraced by other courts in the special circumstances of a lockbox financing arrangement: that such an arrangement – which uniquely enables the lender to drain the borrower of all liquid capital – is suffused with a duty on

8

the part of the lender to maintain the lending relationship while the borrower obtains alternate financing. The Trustee argues that the issue on appeal is whether a lender in those circumstances has unfettered discretion to exit the lockbox line of credit, or whether the lender has an obligation to provide the borrower with reasonable notice and opportunity to refinance the debt. The Court agrees that the Interlocutory Order presents a controlling question of law as to the appropriate legal standard applicable to lender advances under lockbox lines of credit.

Kore argues that the proposed appeal does not primarily involve a question of law that can be "quickly and cleanly" reviewed. According to Kore, although the Trustee's basis for an interlocutory appeal may implicate legal issues of contract interpretation and the scope of the implied duty of good faith and fair dealing in a contractual relationship, this Court would also be required to review and study the Trustee's factual allegations, which also informed the Bankruptcy Court's ruling. But the issue is clearly a legal, not factual, dispute, as borne out by the fact that this appeal arises from a ruling on a motion for judgment on the pleadings, which is reviewed under the same standards as a motion to dismiss.

Kore further argues that the issue raised by the Trustee, at best, implicates only the Bankruptcy Court's rulings as to the breach of contract (Counts I and VIII). Thus, Kore argues, even if the Trustee were to prevail on his arguments raised in the Motion for Leave, such a finding "would not disturb the Bankruptcy Court's ruling on most of the dismissed counts from the Amended Complaint, and, thus, a controlling issue is not implicated." (D.I. 4 at 4). The Court disagrees. The Bankruptcy Court's conclusion that Kore had unfettered discretion to make (or not make) advances, underpinned its decision to dismiss each of the counts dismissed: "Kore had broad contractual authority to withhold advances. Consequently Counts I-VI and Count VIII in the Amended Complaint are barred as a matter of law, and judgment on the pleadings will be

entered in favor of Kore on those counts." *In re Moon Group, Inc.*, 2022 WL at 4658615, at *1; *see also id*. at *10 ("The asserted extra-contractual obligations are the predicate for a majority of the counts in the Amended Complaint, and as a result, the Trustee has failed to state any cause of action by which the Court can grant related relief for Counts I-VI and Count VIII"). And as the Trustee explains:

> Count II is a claim for breach of the implied covenant of good faith and fair dealing. Such claim contends that if Kore did not breach an *express* provision of the parties' contracts, it breached the implied covenant of good faith and fair dealing applicable thereto. Obviously, such Count would be revived if the Subject Order is reversed as to the controlling issue of law. Count III is a claim for tortious interference, which is predicated upon the fact that Kore threatened the Moon Entities' largest customer, Stonemor, and then filed a lawsuit against Stonemor (which it continued to prosecute even after it was repaid all but the disputed fees still at issue in Kore's Counterclaim) for "diverting" payments to the Moon Entities. However, such alleged diversion only occurred *after* Kore had committed a material predicate breach of the contracts by and between the Moon Entities and Kore by refusing to make a necessary advance. It is the Moon Entities' position that such predicate breach relieved the Moon Entities (and their customers) of any obligations under the loan documents related to the Lockbox. Thus, again, if the Subject Order is reversed as to the issue of Kore's discretion, the dismissal of Count III would also be reversed. A finding of a Kore predicate default could be proven provided that Kore lacks unfettered discretion to refuse an advance.

(D.I. 6 at 3-4). The Court must reject Kore's arguments that no controlling question of law has been asserted or that one has only been asserted with respect to Counts I and VIII.

### B.     Substantial Ground for Difference of Opinion as to its Correctness

"The 'controlling question of law' also must be one as to which there is 'substantial ground for difference of opinion.'" *In re Boy Scouts of Am.,* 2021 WL 1174573 at *4 (citing 28 U.S.C. § 1292(b)). "This calls for more than mere disagreement with the ruling of the bankruptcy court." *Id.* To satisfy this standard, "the difference of opinion must arise out of genuine doubt as to the

10

correct legal standard." *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195, 208 (D.N.J. 1996), *aff'd,* 141 F.3d 1154 (3d Cir. 1998).

The Court agrees that substantial ground for difference of opinion exists as to the correctness of the Interlocutory Order. Trustee has cited to three other jurisdictions which have imposed a heightened duty of care on lockbox lenders based upon the substantial control they have delegated to themselves by virtue of their control over their borrower's cash flows: *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 759 (6th Cir. 1985), *Quality Automotive Co. v. Signet Bank/Maryland,* 775 F. Supp. 849, 853 (D. Md. 1991), and *In re Bailey Tool & Mfg. Co.*, 2021 Bankr. LEXIS 3502, 2021 WL 6101847 (Bankr. N.D. Tex. Dec. 23, 2021). In those cases, courts confronted with "lock box" line of credit lender agreements have uniformly held that a good faith standard limits the lender's discretion to cut off the financial lifeline of funding advances. No other court in this District has addressed the comportment required of a lender in the context of a lockbox line of credit. Every other federal court to consider the lockbox lending relationship reached a different conclusion.

Kore argues that the Bankruptcy Court properly rejected the Trustee's cases in favor of controlling authority under Maryland law. As explained by the Bankruptcy Court, although Maryland law recognizes the implied duty of good faith and fair dealing (including in the lending context), courts have repeatedly clarified that this duty does not obligate a party to take affirmative actions that it is clearly not required to take under the contract. Indeed, the Bankruptcy Court cited several cases that support its conclusion. *See In re Moon Group Inc.,* 2022 WL 4658615, at *9 (citing *Marland v. Safeway, Inc.*, 65 Fed. Appx. 442, 449 (4th Cir. 2003)). None of those cases, however, dealt with the unique circumstances of a lockbox lending arrangement. Kore, in its

opposition to the Motion for Leave, cites only to cases which involve non-lockbox lending arrangements.

The Court agrees that whether a heightened duty exists by virtue of the lockbox arrangement, given the significantly greater control a lender has over the continued viability of a business in such an arrangement, presents the required substantial grounds for difference of opinion.

### C. Material Advancement of the Ultimate Termination of the Litigation

Of the three factors for interlocutory appeal under § 1292(b), "courts place particular weight on whether immediate appeal will materially advance the ultimate termination of the litigation." *In re* Paragon Offshore PLC, 2020 WL 1815550, at *3 (D. Del. Apr. 9, 2020) (citation and internal quotations marks omitted). An interlocutory appeal "materially advances" the litigation if it would "(1) eliminate[] the need for trial, (2) eliminate[] complex issues so as to simplify the trial, or (3) eliminate[] issues to make discovery easier and less costly." Id. (citation and internal quotation marks omitted).

The Court agrees that allowing an appeal at this stage will materially advance the finality of this litigation. As the Trustee points out, his claims and Kore's counterclaim are fully intertwined and, in many respects, different sides of the same coin. Kore's counterclaim, primarily made up of "overadvance" and legal fees incurred by Kore over and above the principal and interest that has already been repaid to Kore, are premised upon the theory that the credit limit under the Line of Credit had not been increased, and that the Moon Entities were the first party to default. If interlocutory review is granted, and if the Interlocutory Order is overturned, then Kore's counterclaim, and Moon's affirmative claims can be heard at a single trial. Conversely, if interlocutory review is not granted, and Kore's counterclaim is permitted to proceed to trial (and if Kore were to prevail), if and when the Moon Entities ultimately prevail on a post final judgment

appeal of the Interlocutory Order, given the wholly interrelated nature of the competing claims, Kore's claims will have to be retried, resulting in a waste of resources. Any decision on Kore's counterclaim prior to an appeal of the Interlocutory Order necessarily would be based upon the present law of the case (i.e. that Kore had unfettered discretion to withhold advances and pass along hundreds of thousands of dollars of attorneys' fees). Efficiency is best served by resolving the controlling issue of law – either upholding the Interlocutory Order or reversing it – and allowing the two competing sets of claims to be tried at a single trial.

### IV.   CONCLUSION

For the reasons explained above, the Court will grant Trustee's Motion for Leave to appeal the Interlocutory Order. An appropriate order follows.