IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOON GROUP, INC., et al., | Bankr. No. 21-11141 (JKS) |
| | (Jointly Administered) |
| Debtors. | |
| DON A. BESKRONE, Chapter 7 Trustee of MOON GROUP, INC., et al., | Adv. No. 21-51176 (JKS) |
| Appellants, | |
| v. | C.A. No. 23-620 (MN) |
| KORE CAPITAL CORPORATION, | |
| Appellee. | |

## MEMORANDUM OPINION

Ricardo Palacio, Gregory A. Taylor, ASHBY & GEDDES, P.A., Wilmington, DE; Philip S. Rosenzweig, Genevieve S. McCormack, William C. Katz, SILVERANG, ROSENZWEIG & HALTZMAN, LLC, King of Prussia, PA – Attorneys for Appellant, Don A. Beskrone, Chapter 7 Trustee of Moon Group, Inc., *et al.*

Michael G. Busenkell, GELLERT SCALI BUSENKELL & BROWN, LLC, Wilmington, DE; David S. Musgrave, GORDON FEINBLATT LLC, Baltimore, MD – Attorneys for KORE Capital Corporation.

March 25, 2024
Wilmington, Delaware

**NOREIKA, U.S. District Judge**

Pending before the Court is the appeal by Don A. Beskrone ("the Trustee"), Chapter 7 Trustee of Moon Group, Inc. and its affiliated chapter 7 debtors (together, "the Moon Entities" or "the Debtors") from the Bankruptcy Court's September 30, 2022 Order (Adv. D.I. 81; D.I. 1-3)[1] ("the Interlocutory Order") and accompanying Opinion, *Beskrone v. KORE Capital Corporation (In re Moon Grp., Inc.)*, 2022 WL 4658615 (Bankr. D. Del. Sept. 30, 2022) ("the Opinion"). The appeal arises in an adversary proceeding against appellee KORE Capital Corporation ("KORE"), alleging various causes of action based on KORE's refusal to fund advances to the Moon Entities under a "lockbox" line of credit agreement,[2] which resulted in the Moon Entities' inability to fulfill customer contracts or operate their businesses, and preceded their subsequent bankruptcy. The Interlocutory Order granted, in part, a motion for judgment on the pleadings in favor of KORE with respect to seven of the eight counts of the amended complaint (Adv. D.I. 12) ("the Amended Complaint"). The accompanying Opinion determined, among other things, that the loan agreement provided KORE with sole discretion in making advances; that Kore's refusal to advance funds did not prevent the Moon Entities from performing their obligations under the loan agreement; and that breach of the implied duty of good faith and fair dealing is not an independent cause of action under applicable Maryland law. *In re Moon Grp.,* 2022 WL 4658615, at *5 n.36; *9-10.

The Trustee sought leave to appeal the Interlocutory Order pursuant to Federal Rule of Bankruptcy Procedure 8004(a) on the basis that the implied duty of good faith and fair dealing, as recognized under Maryland law, imposes a heightened duty of care on lockbox lenders based upon

---

[1] The docket of the chapter 7 cases, captioned *In re Moon Grp., Inc, et al.*, 21-11140 (JKS), is cited herein as "B.D.I. _____." The docket of the adversary proceeding, captioned *Beskrone v. KORE Capital Corp.*, Adv. No. 21-51176 (JKS), is cited herein as "Adv. D.I. \_\_."

[2] Lockbox financing arrangements are also referred to as "factoring agreements" or "blocked accounts."

their control over their borrower's cash flows. (Misc. No. 22-470, D.I. 1). The Trustee argued that federal courts confronted with similar "lockbox" lender agreements have held that the good faith standard limits the lender's discretion to cut off the financial lifeline of funding advances without notice. This Court accepted the interlocutory appeal for review on the basis that the issue had not yet been addressed by a court in this District, and the three federal courts to consider such a lockbox lending arrangement reached a different conclusion than the Bankruptcy Court reached here. *In re Moon Grp.,* 2023 WL 3848338 (D. Del. June 6, 2023). Because there is no genuine issue of material fact as to whether KORE breached the express terms of the lending agreement, and because Maryland law does not recognize a separate cause of action for breach of the implied duty of good faith and fair dealing, the Court must affirm this aspect of the Interlocutory Order.

I.     **BACKGROUND**

    A.     **The Parties**

The Moon Entities, a centuries-old business, operated several business lines: a wholesale tree and shrubbery nursery; a commercial landscape maintenance and site management company; and a landscape construction business. The Moon Entities serviced large commercial contracts, primarily on a seasonal basis, which is a cash-intensive business model. Given this kind of work, the Moon Entities carried substantial accounts receivable, which from time to time, resulted in cash flow shortages when awaiting remittances from customers. The Moon Entities required a substantial line of credit to ensure adequate cash flow.

KORE provides lines of credit secured primarily by accounts receivable, as well as "factoring" loans. KORE borrows capital from other lenders, earning a profit from the margin between the rate at which it borrows these funds and the higher rate at which it lends them.

One of the Moon Entities – Moon Landscaping, Inc. ("MLI") – was a party to a master service agreement with StoneMor Operating LLC ("the StoneMor Agreement") the terms of which would

have extended through December 31, 2024. StoneMor is a leading owner and operator of cemeteries and funeral homes, and, prior to this dispute, the Moon Entities' largest customer.

### B. The "Lockbox" Loan Agreement

Although the Moon Entities had two existing loan facilities secured by certain of the Moon Entities' real and personal property, the cyclical cash flow needs as a result of the seasonality of their businesses required additional liquidity. On May 15, 2020, the Moon Entities entered into a revolving credit agreement with KORE ("the Revolving Credit Agreement"). Under the Revolving Credit Agreement, KORE may advance funds to the Moon Entities based on invoices issued by the Moon Entities to their customers for services rendered. The Revolving Credit Agreement, along with all the loan modifications thereto, are collectively referred to as the "Loan Agreement." The line of credit under the Loan Agreement was secured by a security interest in the Moon Entities' accounts receivable. The amount that the Moon Entities were permitted to draw from the line of credit was based upon a percentage of the Moon Entities' then outstanding accounts receivable. KORE initially agreed to advance the Moon Entities 80 percent of the receivables for customers other than StoneMor, but only 35 percent of the StoneMor receivables.

The Loan Agreement contemplates that the Moon Entities' receivables would be paid by customers directly to KORE through a "lockbox" financing arrangement. Under this arrangement, the Moon Entities were in the position of asking KORE for all funding, as all of their accounts receivable were paid into the lockbox operated by KORE. In turn, KORE generally advanced funds (not exceeding the above-noted percentages) to meet the Moon Entities' short-term cash flow needs. Thus, the Moon Entities' ability to pay its debts as they came due was wholly dependent upon KORE making advances under the Loan Agreement. Section 2.1 of the Loan Agreement provides, in part:

> 2.1 <u>Credit Facility</u>. At Borrower's request during the Term of this Agreement, Lender ***in its sole discretion*** may make Advances to Borrower, subject to receipt of such financial information as Lender shall require and as otherwise provided in this Agreement.

(Amended Complaint, Ex. 1 at § 2.1 (emphasis added)).  Section 2.3 of the Revolving Credit Agreement provides, in part:

> 2.3 <u>Adjustments</u>. ***Lender shall determine*** the amount that may be made available to Borrower under the [Revolving] Credit Facility based on the most recent Accounts Reporting Certificate delivered to Lender in accordance with this [Revolving Credit] Agreement and such other information as may be available to Lender.

(*Id*. § 2.3) (emphasis added).  The Revolving Credit Agreement contained the following termination provision:

> [I]f the Lender exercises ***its discretion*** to cease making Advances under this Agreement and no Event of Default has occurred and is continuing, Borrower may terminate this Agreement by delivering 10 days written notice to Lender and, in such event, Borrower shall not be liable to Lender for any Termination Fee.

(*Id*. at § 10.12 (emphasis added)).  The Moon Entities and KORE modified the terms of the Revolving Credit Agreement through four written agreements, the most recent of which was executed a few weeks before the alleged breaches occurred, to increase both the credit limit and the percentage of StoneMor receivables relative to which KORE would make advances.  In each modification, the Moon Entities: (i) ratified and confirmed that the loan documents continued to be in full force and effect except as otherwise modified in that particular agreement, (ii) agreed that the loan documents were fully enforceable against the Moon Entities, and (iii) agreed that no amendments or waivers were effective unless set forth in a signed writing.  (*See e.g.*, Amended Complaint, Ex. 6, Waiver/Loan Modification Agreement, dated June 28, 2021, §§ 7, 9(v), 11).

### C.  **KORE's Refusal to Fund the Line of Credit**

Notwithstanding these modifications, the Amended Complaint asserts that the time period between the Moon Entities' request for funding and KORE's advances expanded, exacerbating the Moon Entities' liquidity issues.  (Amended Complaint ¶ 31).  In July 2021, KORE demanded that the Moon Entities engage a financial "cash flow consultant," selected by KORE, at the Moon Entities'

4

expense, and they declined. (*Id*. ¶¶ 32-37). Around the same time, the Amended Complaint asserts, the outstanding principal balance of the line of credit was approximately $5 million, while the Moon Entities' accounts receivable totaled approximately $9 million; accordingly, the Amended Complaint contends, KORE was oversecured. (*Id*. ¶ 36).

On or about July 10, 2021, KORE refused to fund the next draw on the line of credit. (*Id*. ¶ 45). Upon KORE's denial of funding, the Moon Entities anticipated failing to make payroll, which would have caused a default under the StoneMor Agreement. To avoid such a default, the Moon Entities requested StoneMor pay its upcoming invoice directly to the Moon Site Entities. (*Id*.)

On July 16, 2021, KORE issued a Notice of Default to the Moon Entities. (*Id*. ¶ 47). In response, the Moon Entities asserted that the declaration of default was invalid and that KORE breached the Agreement first by refusing and/or failing to fund the next draw. (*Id*. ¶ 49). On July 23, 2021, KORE filed a complaint in confession of judgment against the Moon Entities, as well as a receivership action seeking imposition of a receivership over the Moon Entities. (*Id*. ¶ 55). In addition, KORE filed a civil suit against StoneMor first in the Court of Common Pleas of Bucks County, Pennsylvania, and then in United States District Court for the Eastern District of Pennsylvania. (*Id*. ¶ 59). KORE's civil suit against StoneMor alleges a cause of action for breach of contract based on KORE's contention that it "stands in the shoes of [the Debtors] with respect to StoneMor's obligations to pay [pre-petition] amounts due to Moon" and that StoneMor breached its contract with the Debtors by making three pre-petition payments to the Debtors rather than to KORE. (*Id*. ¶ 61). KORE has continued to prosecute its civil suit against StoneMor even after receiving payment in full. (*Id*. ¶¶ 65, 69).

D. **The Bankruptcy Cases**

The Moon Entities filed voluntary chapter 11 petitions on August 12, 2021. The Trustee asserts that the Moon Entities' ability to quickly secured debtor-in-possession financing demonstrated

5

that, had KORE provided good faith notice and a reasonable opportunity to refinance, the Moon Entities' business would not have been destroyed. The Debtors' cases were later converted to cases under chapter 7 of the Bankruptcy Code. On September 17, 2021, Debtors paid KORE $5,455,456.13, representing one hundred percent (100%) of the principal and interest due to KORE on the line of credit, subject to a reservation of rights with respect to the matters complained of in the Adversary Proceeding.

The Amended Complaint includes the following claims: (i) breach of contract, (ii) breach of implied duty of good faith and fair dealing, (iii) tortious interference with contract, (iv) common law fraud, (v) fraudulent misrepresentation, (vi) promissory estoppel, and (vii) violation of the automatic stay. Prosecution of the Amended Complaint was assumed by the Trustee upon conversion of the cases. KORE's answer contains a counterclaim seeking various fees – including overadvance fees, diversion of payment fees, field examination expenses, bond charges, termination fee, consulting fees, wire fees, and legal fees and expenses – which, as of September 27, 2021, totaled approximately $727,000, exclusive of interest. (Adv. D.I. 13 at 14).

### E. The Interlocutory Order

On March 2, 2022, KORE moved for judgment on the pleadings with respect to the Amended Complaint, arguing that it had unfettered discretion to exit the lockbox lending arrangement based on the plain language of the Agreement. (Adv. D.I. 26). Because there is an implied duty of good faith and fair dealing, the Trustee argued in opposition, the lender does not have unfettered discretion to exit the lockbox line of credit; rather, the lender has an obligation to provide the borrower with reasonable notice and opportunity to refinance the debt. (*See id*. at 13-18). The Trustee asserted that, in the very few times that a federal court has considered a lockbox line of credit financing arrangement, that court has imposed upon the lockbox lender an obligation not to exit the line of credit without notice, but rather to give the borrower a window in which to refinance, because the

lender controls the borrower's liquid assets. (*See id*.). The Trustee cited three cases in support of his position: *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 759 (6th Cir. 1985); *Quality Automotive Co. v. Signet Bank/Maryland*, 775 F. Supp. 849, 853 (D. Md. 1991); and *In re Bailey Tool & Mfg. Co.*, 2021 WL 6101847 (Bankr. N. D. Tex. Dec. 23, 2021).

The Bankruptcy Court rejected the Trustee's argument, distinguishing the cases on which he relied, and holding that the "sole discretion" language in the Loan Agreement gave KORE unfettered discretion to make or withhold advances and exit the Loan Agreement at any time. *In re Moon Grp.*, 2022 WL 4658615, at *9. As the Bankruptcy Court further explained, Maryland law governs the Agreement, and while Maryland law recognizes the implied duty of good faith and fair dealing (including in the lending context), Maryland courts have clarified that this duty does not obligate a party to take affirmative actions that it is clearly not required to take under the contract. *See id.* "KORE had broad contractual authority to withhold advances. Consequently, Counts I-VI and Count VIII in the Amended Complaint are barred as a matter of law, and judgment on the pleadings will be entered in favor of KORE on those counts." *Id*. at *1.[3]

On October 14, 2022, the Trustee filed his Notice of Appeal, together with his motion for leave to appeal the Interlocutory Order. (Misc. No. 22-470, D.I. 1). The Court granted leave on June 6, 2023. (*Id.*, D.I. 9). The merits of the appeal are fully briefed. (D.I. 18, 19, 20). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

---

[3] With respect to Count VII, alleging that KORE's post-petition pursuit of StoneMor violates the automatic stay under § 362 of the Bankruptcy Code, the Bankruptcy Court found "as a matter of law that Kore did not violate the automatic stay by pursuing its contractually granted claims against StoneMor." *In re Moon Grp.*, 2022 WL 4658615, at *20. But because "it is plausible that Kore's pursuit of the Excess Estate Funds is a violation of the automatic stay," the Bankruptcy Court denied the motion for judgment on the pleadings "as to Count VII as to the Excess Estate Funds and will not dismiss Count VII of the Amended Complaint as a matter of law." *Id*.

## II. JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal, with leave of court, from interlocutory orders and decrees, pursuant to 28 U.S.C. § 158(a)(3).

Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). On appeal, the standard of review for a motion for judgment on the pleadings under Rule 12(c) is plenary. *See Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988). Under Rule 12(c), "judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1054 (3d Cir. 1980) (internal quotation marks and citation omitted). In considering a motion for judgment on the pleadings, a court is required to "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id*. (quoting 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1368 at 690 (1969) (footnotes omitted)).

## III. DISCUSSION

Although the Bankruptcy Court examined and applied the language contained in the Loan Agreement, the Trustee argues, the Bankruptcy Court erred by treating the Loan Agreement like any other lending agreement. As the Trustee explains, the key risk of a loan with a lockbox mechanism is that "the [lender's] failure to advance funds would have left the borrower without any operating capital unless he could have secured alternative financing." (D.I. 18 at 10 (quoting *Shaughnessy v. Mark Twain State Bank*, 715 S.W.2d 944, 953 (Mo. Ct. App. 1986))). Unique among lending arrangements, these potentially predatory loans endow lenders with the "sudden, effective strangulation of [the borrower]'s economic lifeline[.]" *Id*. (quoting *Canterbury Realty & Equipment Corp. v. Poughkeepsie Sav. Bank*, 135 A.D.2d 102, 105 (N.Y. App. Div. 1988)). In failing to consider

8

the unique nature of lockbox lending agreements, the Trustee argues, the Bankruptcy Court dismissed the principle embraced by other courts in the special circumstances of a lockbox financing arrangement: that such an arrangement – which uniquely enables the lender to drain the borrower of all liquid capital – is suffused with a duty on the part of the lender to maintain the lending relationship while the borrower obtains alternate financing. (*See id.* at 11, 23-25). As framed by the Trustee, the issue on appeal is whether a lender in those circumstances has unfettered discretion to exit the lockbox line of credit, or whether the lender has an obligation to provide the borrower with reasonable notice and an opportunity to refinance the debt. (*See id.*)

Conversely, KORE argues "[t]here is no allegation that KORE breached the terms and conditions of the Loan Agreement," and because Maryland does not recognize breach of the implied duty of good faith and fair dealing as an independent cause of action, judgment on the pleadings was properly granted in its favor with respect to Counts I-VI and VIII. (D.I. 19 at 2; *see* 14-20).

> **A.   There Is No Material Issue of Fact as to Whether KORE Breached An Express Term of the Loan Agreement**

The Bankruptcy Court held that there was no material issue of fact as to whether KORE breached any express term of the Loan Agreement. As discussed further below, a consideration of this issue is required to determine the issue for which leave to appeal was granted. KORE argues that all of its actions were expressly allowed under the Agreement. The Agreement gives KORE broad discretion over whether to fund advances to the Moon Entities. (Loan Agreement § 2.1 ("Lender *in its sole discretion* may make Advances to Borrower . . .") (emphasis added)); Loan Agreement § 2.3 ("**Lender shall determine** the amount that may be made available to Borrower under the Credit Facility . . ."). The Loan Agreement further states: "Notwithstanding the foregoing, if Lender exercises its discretion to cease making Advances under this Agreement and no Event of Default has occurred and is continuing, Borrower may terminate this Agreement by delivering 10 days written

9

notice to Lender and, in such event, Borrower shall not be liable to Lender for any Termination Fee." (Loan Agreement § 10.12).

The Amended Complaint asserts that Section 2.1 of the Agreement obligates KORE to fund any advances once the Moon Entities furnish requested financial information, and that KORE failed to honor this obligation without justification. (Amended Complaint, ¶ 79). Section 2.1 of the Agreement, however, provides: "At Borrower's request during the Term of this Agreement, Lender *in its sole discretion* may make Advances to Borrower, subject to receipt of such financial information as Lender shall require and as otherwise provided in this Agreement." (Loan Agreement, § 2.1 (emphasis added)). According to KORE, "there is no reasonable way to read that provision as obligating KORE to fund advances to the Moon Entities, such that KORE's refusal to do so would trigger a default under the Loan Agreement." (D.I. 19 at 11). The Court agrees.

The Amended Complaint further asserts that KORE improperly refused to fund an advance (thereby breaching the Loan Agreement) on the mistaken premise that the Moon Entities had exceeded the credit limit under the Loan Agreement. (Amended Complaint ¶¶ 77-78). This argument, however, overlooks the plain language of Section 2.1 of the Loan Agreement, which affords KORE the authority to determine whether to fund advances in its sole discretion. The Trustee has cited no written modification that changed the discretionary funding of advances. Accordingly, such an exercise of discretion, whatever its motivation, cannot be a breach of contract.

Amended Complaint further alleges that KORE assessed improper overadvance fees under the Loan Agreement in an unspecified amount, including during the period from January 21, 2021 through February 20, 2021. (Amended Complaint, ¶¶ 146-150). The Moon Entities agreed, however, on four separate occasions (including as recently as June 28, 2021) that all interest, fees and other charges imposed and collected by KORE were valid, correct and proper, and complied in all respects with the Loan Agreement. (*See* Loan Modification Agreement dated September 16, 2020, § 8(i);

10

Forbearance/Loan Modification Agreement dated December 30, 2020, § 11(i); Second Loan Modification Agreement dated May 24, 2021, § 8(i); and Waiver/Loan Modification Agreement dated June 28, 2021, § 9(i)). The Moon Entities also agreed that they had violated the Loan Agreement's overadvance provision (Section 2.9) as recently as June 28, 2021. (*See* Waiver/Loan Modification Agreement dated June 28, 2021, § 3).

The Bankruptcy Court properly held that there was no material issue of fact as to whether KORE breached the express provisions of the Loan Agreement.

### B. Maryland Law Does Not Recognize Breach of the Implied Covenant of Good Faith and Fair Dealing as an Independent Cause of Action

Contrary to KORE's assertions, the Trustee's primary argument is grounded in the contractual nature of its relationship to KORE. The Trustee argues that the Bankruptcy Court improperly disregarded the implied duty of good faith and fair dealing, which is recognized under Maryland law, in granting judgment on the claims at issue.

The Trustee relies primarily on three cases, including *In re Bailey Tool & Mfg. Co.*, 2021 WL 6101847 (Bankr. N.D. Tex. Dec. 23, 2021), which involved similar financing features, but also additional allegations of bad faith including overreaching by the lender. In that case, Bailey Tools and its affiliates each entered into a factoring agreement and a revolving inventory loan agreement with lender Republic Business Credit. *Id*. at *6. The inventory loan agreements were, according to their terms, each intended to be a revolving line of credit for the Bailey Tools' working capital under which Republic might make advances from time to time. *Id.* Republic's collateral was to be not merely "Inventory," wherever located, but general intangibles, accounts, and proceeds. *See id.* at *11-13. Republic failed to treat all of Bailey Tools' accounts receivables as eligible for advances, however, and did not advance the allowed 90 percent of the accounts receivable. *See id*. This caused Bailey Tool to default on an installment plan to repay back county taxes, resulting in Republic

11

declaring a default on the inventory loan agreements and factoring agreements. *See id*. at *13. Bailey Tool declared bankruptcy and failed. The bankruptcy court held that:

> Republic's breaches of contract ultimately caused Bailey's bankruptcy, the associated destruction of Bailey's enterprise value, and future as a going concern. Republic's material breaches of contract caused substantial and lasting negative impacts on Bailey's cash flows at a time when Bailey's very future was on the brink, and just as the Company was anticipating a pivot to a likely lucrative ammunition manufacture business model. ***It was reasonably foreseeable for a factoring company dealing with distressed businesses to know and understand that depriving a business of essential cash flow when at its most dire position would cause lasting and permanent economic losses. Bailey was no exception. As a result, Bailey was unable to successfully transition or pivot its business to a more sustainable and valuable ammunition manufacturing business.***

*Id*. at *39 (emphasis added). The bankruptcy court found that by, among other things, "holding monies that rightfully belonged to Bailey [Tool]," Republic breached of the duty of good faith and fair dealing and awarded damages, including on account of the destruction of the legacy business.

The Trustee further relies on a Sixth Circuit decision, *K.M.C. Co. v. Irving Tr. Co*., 757 F.2d 752 (6th Cir. 1985), which addressed a more similar factual pattern. In that case, the borrower K.M.C. Company, Inc., a wholesale and retail grocery business, sued lender Irving Trust Company for breach of a financing agreement. Pursuant to the financing agreement, Irving agreed to extend K.M.C. up to $3 million in credit, secured by K.M.C.'s accounts receivable and inventory in a lockbox or "blocked account;" the availability of credit was determined by a borrowing base formula. *See K.M.C.*, 757 F.2d at 754. On March 1, 1982, Irving refused without notice to advance K.M.C's request of $800,000, even though the advance was available under the terms of the financing agreement. *See id*. K.M.C. ultimately collapsed and sued Irving. A jury found that Irving breached the contract and awarded K.M.C. $7.5 million in damages. *Id*. at 752. The Sixth Circuit affirmed the jury's verdict, holding that the requirement of good faith and fair dealing obligated Irving to give notice to K.M.C. "Crucial to the court's analysis," the Trustee argues, "was the fact that all of K.M.C.'s receipts were

placed into the blocked account, depriving K.M.C. of any working capital while any portion of the line of credit was outstanding." (D.I. 18 at 12-13).  Indeed, the Sixth Circuit observed that the interpretation urged by the lender in that case "would leave K.M.C.'s continued existence entirely at the whim or mercy of [the lender], absent an obligation of good faith performance." *K.M.C.*, 757 F.2d at 759.  "Logically, at such time as [the lender] might wish to curtail financing K.M.C., as was its right under the agreement, this obligation to act in good faith would require a period of notice to K.M.C. to allow it a reasonable opportunity to seek alternate financing, absent valid business reasons precluding Irving from doing so." *Id*.

The Bankruptcy Court, in its thorough Opinion, considered the similar holdings in both *Bailey Tool* and *K.M.C*.  *In re Moon Grp*., 2022 WL 4658615, at *7-*9 & n.52.  With respect to the latter, the Bankruptcy Court correctly noted its abrogation by the Fourth Circuit in *Marland v. Safeway, Inc*., 65 Fed. Appx. 442, 449 (4th Cir. 2003):

> [I]n *Marland v. Safeway Inc*., the Fourth Circuit abrogated the holding in *K.M.C*.  Kore is correct that the implied duty of good faith and fair dealing is not an unfettered obligation, nor an independent cause of action under Maryland law, and Maryland courts have recognized that this duty does not obligate a party to take affirmative actions that are not required under the contract.

*In re Moon Grp.,* 2022 WL 4658615, at *9 (citations omitted; emphasis added).

The Trustee acknowledges that "Maryland law governs the Line of Credit, and although Maryland law recognizes the implied duty of good faith and fair dealing (including in the lending context), courts have clarified that this duty does not obligate a party to take affirmative actions that it is not clearly required to take under the contract." (D.I. 18 at 14 (citing *Marland*, 65 Fed. Appx. at 449)).  The Trustee disagrees, however, with the Bankruptcy Court's determination that *Marland* nullified *K.M.C*. because "the *Marland* holding did not address a lockbox or blocked account lending

13

device." (*Id.*). On appeal, the Trustee argues that the Bankruptcy Court's characterization of *Marland* failed to appreciate "the special chokehold affected by the lockbox lender." (*Id.* at 14).

The Court agrees with the Trustee that *Marland* did not address the complexities of a lockbox line of credit; indeed, it did not address a loan agreement at all. Under the terms of the Loan Agreement, however, the Court is required to apply Maryland law, and no party has cited any other authority holding that the implied duty of good faith and fair dealing is an independent cause of action that may be asserted under Maryland law.

*Quality Automotive Co. v. Signet Bank/Maryland*, 775 F. Supp. 849, 853 (D. Md. 1991) is the lone Maryland decision cited by the Trustee that recognized a separate cause of action for breach of the implied duty of good faith and fair dealing. That case involved a lockbox loan of "up to $2,000,000 [in] credit to be used for working capital, debt payment, and for financing the sale of automobile parts on the automotive repair market." *Quality Automotive*, 775 F. Supp. at 851. Plaintiff alleged that the defendant lender terminated its line of credit to a borrower in retaliation for the borrower doing business with a competitor bank, and "that the defendant breached a duty of good faith with respect to the loan and security contract when it terminated [Plaintiff]'s line of credit and stopped replenishing [Plaintiff]'s operating account." *Id*. In response to the lender's motion to dismiss for failure to state a claim, the district court held that "the defendant [] had a duty to exercise good faith with regard to notice when deciding to terminate the loan and security agreement." 775 F. Supp. at 853. The lender, however, prevailed at summary judgment, and the Fourth Circuit affirmed the judgment. *See Quality Automotive Co. v. Signet Bank Maryland*, 983 F.2d 1057 (4th Cir. 1993) ("We affirm the district court's granting of summary judgment in favor of [the lender] on the grounds that [plaintiff] failed to present any evidence upon which a reasonable jury could find that [the lender] breached the term of its 1985 loan agreement.").

14

In *Parker v. The Columbia Bank,* 604 A.2d 521, 531 (1992), the Maryland Court of Special Appeals explained that the implied duty of good faith did not require a lender to take an affirmative action not otherwise required by the loan documents, calling into question *Quality Automotive Co.* A 1993 decision by the District of Maryland followed, holding that there is no separate cause of action for breach of the duty of good faith and fair dealing under Maryland law. *See Howard Oaks, Inc. v. Md. Nat'l Bank,* 810 F. Supp. 674, 677 (D. Md. 1993). Subsequent cases agreed with *Howard Oaks*.[4] In 2003, the Fourth Circuit abrogated *Quality Automotive Co.* in holding that there is no separate cause of action for breach of the duty of good faith and fair dealing. *See Marland*, 65 Fed. Appx. at 449.

The Trustee argues that "[w]hether the lockbox lender's duty to deal in good faith with the borrower by providing notice and an opportunity to refinance is enforced through an independently pled cause of action or wrapped up in a breach of contract claim is mere semantics" and should not detract from the principles set forth in *Quality Assurance.* (D.I. 18 at 14). But the parties cite no cases addressing this proposition, and it seems at odds with the broad ruling of the Fourth Circuit. *See Marland*, 65 Fed. Appx. at 449 ("We agree with the weight of this authority that no independent cause of action of this type is recognized in Maryland.").

Maryland case law supports KORE's position that breach of the implied duty of good faith and fair dealing merely supports a cause of action for breach of contract, "prohibit[ing] one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Cutler v. Wal-Mart Stores, Inc.,* 927 A.2d 1, 11 (2007) (quoting *Mount Vernon Props., LLC v. Branch Banking and Trust Co.,* 907 A.2d 373, 381 (2006)). "The duty of good faith

---

[4]  *See Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 794 (D. Md. 2002); *Paramount Brokers, Inc. v. Digital River, Inc.*, 126 F. Supp.2d 939, 945 (D. Md. 2000); *Abt Assoc., Inc. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 534 (D. Md. 2000); *Baker v. Sun Co. (R & M)*, 985 F. Supp. 609, 610 (D. Md. 1997).

15

merely obligates a lender to exercise good faith in performing its contractual obligations; it does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents." *Parker,* 604 A.2d at 531. Moreover, "[a]n implied duty of good faith cannot be used to override or modify explicit contractual terms." *Riggs Nat. Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994); *see Waller v. Maryland Nat'l Bank,* 620 A.2d 381, 388 ("The implied duty of good faith does not change the terms of the contract."), *vacated on other grounds,* 631 A.2d 447 (Md. 1993); *Bob Smith Automotive Group, Inc. v. Ally Financial Inc.*, 2016 WL 3613402, *8-9 (Md. App. 2016) (agreeing with *Waller* that the implied duty of good faith may not be used to extend or add to the obligations a party has accepted under a contract).

It is not disputed that Maryland recognizes the implied duty of good faith and fair dealing in the lending context. Under Maryland law, however, it appears that the ***implied*** duty of good faith and fair dealing cannot protect a borrower unless, as Maryland courts have noted, it is ***express***. *See Baker,* 985 F. Supp. at 610 (parties desiring additional protection from "bad faith" action not explicitly addressed in the contract are free to place an express covenant of good faith in the contract). Thus, in a lockbox lending arrangement where, as here, a lender may in its sole discretion stop advancing funds, the borrower must bargain for protections such as notice. Absent such protections, under Maryland law, a predatory lender may stop advancing funds at any time, cutting off the financial lifeline of an otherwise viable business, even on a whim.

## IV. <u>CONCLUSION</u>

The reasoning set forth in *K.M.C., Bailey Tool,* and *Quality Automotive Co.* is persuasive. The Court finds no basis, however, under Maryland law to hold that the Moon Entities are protected by the implied duty of good faith and fair dealing, as there is otherwise no cause of action for breach of contract, and no authority for the proposition that breach of the implied duty may be asserted as an independent cause of action. For the foregoing reasons, the Court must affirm this aspect of the

Interlocutory Order.  As this is the only aspect of the Interlocutory Order for which leave to appeal was granted, any remaining arguments are not considered here.  A separate Order shall be entered.